# Illinois Official Reports

## Appellate Court

---

### *In re S.T.*, 2021 IL App (5th) 210077

---

| | |
|---|---|
| Appellate Court Caption | *In re* S.T., a Minor (Sarah R. and Kody R., Petitioners-Appellees, v. Michael T., Respondent-Appellant). |
| District & No. | Fifth District<br>No. 5-21-0077 |
| Rule 23 order filed<br>Motion to<br>publish allowed<br>Opinion filed | September 30, 2021<br><br>October 18, 2021<br>October 18, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Franklin County, No. 18-AD-4; the Hon. Thomas J. Foster, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Daniel K. Cockrum, of Benton, for appellant.<br><br>Winter D. Campanella, of Campanella Law Firm, P.C., of Carterville, for appellees. |
| Panel | JUSTICE VAUGHAN delivered the judgment of the court, with opinion.<br>Justices Welch and Barberis concurred in the judgment and opinion. |

¶ 1 Respondent, Michael T., appeals the trial court order terminating his parental rights following a contested adoption proceeding that permitted petitioners to adopt S.T., stating the trial court's findings of unfitness were in error. For the following reasons, we affirm.[1]

## I. BACKGROUND

¶ 2

¶ 3 On February 22, 2018, petitioners, Sarah R. and Kody R., filed a petition for adoption seeking to terminate the parental rights of respondent, Michael T., as to the minor child, S.T., born on September 22, 2012. Sarah, who is married to Kody, is the biological mother of S.T. The petitioners alleged unfitness due to Michael's previous verbal and physical abuse toward Sarah, as well as Michael's guilty pleas for a September 2014 choking incident involving a different woman (Class A misdemeanor), an October 18, 2015, domestic battery case that involved strangulation (Class 2 felony) for which Michael was sentenced to seven years of incarceration, and a November 17, 2015, strangulation incident with a man that was dismissed as part of the plea agreement for the October 18, 2015, incident. The petitioners also alleged that Michael engaged in a course of conduct showing a moral deficiency and an inability or unwillingness to confirm to accepted moral standards and the law due to committing additional offenses including transportation of alcohol as a driver, speeding, obstructing justice, obstructing a peace officer, resisting a peace officer, and leaving the scene of an accident involving property damage.

¶ 4 The petitioners further alleged that Michael showed an intent to forgo his parental rights by his failure to make a good faith effort to pay a reasonable amount of the birth expenses or provide a reasonable amount of financial support for the child. They also contend that Michael failed to maintain a reasonable degree of interest, concern, or responsibility toward the child's welfare, stating that Michael had not seen the child since October 2015 when he was incarcerated. The petition requested the appointment of a guardian *ad litem* (GAL), waiver of an investigation, termination of Michael's parental rights, a judgment for adoption, and a change of the minor child's last name.

¶ 5 On March 21, 2018, Michael entered his appearance and filed an answer that admitted the guilty pleas but denied the allegations of depravity as well as the factual scenarios depicted in the petition. Michael further stated that he made repeated efforts to see and visit with the minor child, but the efforts were denied.

¶ 6 The GAL was appointed on May 1, 2018, and on July 3, 2018, Michael obtained legal counsel who filed a motion to dismiss stating that none of the petitioners' allegations fell within the definition of depravity found at section 1(D)(i) of the Adoption Act (750 ILCS 50/1(D)(i)

---

[1]This is an accelerated appeal under Illinois Supreme Court Rule 311(a) (eff. July 1, 2018). Rule 311(a)(5) provides in relevant part that "[e]xcept for good cause shown, the appellate court shall issue its decision within 150 days after the filing of the notice of appeal." Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). Here, the 150-day period expired on August 20, 2021. However, respondent requested two briefing extensions and petitioners requested one. The requests were granted, and the briefing schedule was extended to September 14, 2021. The case was immediately placed on the next available docket, which was September 22, 2021. Under these circumstances, we find good cause to issue our decision after the 150-day deadline.

(West 2018)). Petitioners responded to the motion, stating that while the statute created a rebuttable presumption for the offenses set forth therein, a party could establish depravity without the use of presumption. On April 16, 2019, the trial court denied the motion and Michael filed an amended answer to the petition.

¶ 7 On November 26, 2019, the GAL issued a report after interviewing the parties. The GAL interviewed Michael on May 18, 2018, and the report noted that Michael's concern seemed more that S.T. would not be able to see his mother than him. Michael advised the GAL that he had not taken parenting, anger management, or substance abuse classes while incarcerated and stated it had to be closer to his discharge date before he would to be eligible to take those classes. At that time, Michael was working in the prison barber shop.

¶ 8 The GAL interviewed Michael's mother, Regina, on June 6, 2019. Regina advised the GAL that she was very attached to S.T. Regina admitted that her husband had been abusive to her in the past, attributing the abuse to alcoholism, and that she had to get an order of protection. Regina was now divorced, but Regina's ex-husband continued to reside in her home. No bonding relationship between Regina's ex-husband and S.T. was noted. Regina stated that she did not think Michael saw her ex-husband abuse her and explained Michael's behavior as being prompted by illegal drug use. Regina denied ever seeing Michael violent and further denied him having a violent temper when he was not abusing drugs or alcohol. Regina admitted that Michael's period of criminal activity was a bad time in his life and stated that Michael was planning to live at her house when he was discharged from prison. Regina stated that after Sarah married Kody, her visitation with the minor child dwindled until it became nil.

¶ 9 The GAL interviewed the petitioners on June 11, 2019, at which time Sarah advised the GAL of Michael's physical abuse. The GAL believed Sarah was intimidated by Michael and viewed him with caution and fear. Sarah stated that she did not have any problem with S.T. spending time with Regina until the minor returned home and stated that Regina showed her pictures of Michael and told her that, even though she had two daddies, only Michael was her real father. Sarah was also concerned that Regina's husband continued to live with Regina because he also had an alcohol problem and could be easily angered. Sarah stated that Regina blamed the women subjected to Michael's violence. Sarah did not want S.T. subjected to this. She wanted to put a family together and try to get over abuse and fear and constant reminders of the past. Sarah had completed school and was working as a registered nurse. The GAL noted that Kody was cordial and pleasant. He expressed his love for S.T. and wanted to be her father. Kody stated that he wanted to give S.T. all the love and affection she needed to grow up fulfilled and happy. While at the petitioners' home, the GAL asked the minor child who the man in the kitchen was, and S.T. laughed and said, "That's my daddy."

¶ 10 Following the interviews, the GAL opined that the adoption would not be the subject of sincere objection by Michael were it not for the relationship between Regina and S.T. The GAL also noted that Regina continued to live with her ex-husband who admittedly was a substance abuser who verbally and physically abused Regina, which was the same home in which Regina wanted to spend time with the child and where Michael would be returning upon his discharge from prison. The GAL did not believe that Sarah and Kody were acting out of malice in seeking adoption but rather out of a sincere desire to adopt the minor to complete and solidify the family unit. The GAL opined that it was in the best interest of S.T. to grant the petition for adoption.

¶ 11    The trial, which encompassed eight days, began on November 26, 2019.[2] During the course of the trial, the court took judicial notice of Michael's convictions and admitted petitioners' exhibits 1 through 7, consisting of (1) Michael's child support payments from February 7, 2014, to April 8, 2019; (2) an order of supervision from 2013 accepting Michael's guilty plea for criminal damage to property and requiring no contact with Jamie Maxey; (3) an information and Michael's guilty plea for battery, related to a September 7, 2014, incident involving the strangulation of Jennifer Miller; (4) Michael's judgment of probation related to leaving the scene of an accident involving property damage in 2015; (5) an information and the grand jury bill of indictment for aggravated domestic battery, statement of facts, judgment, and sentence to the Illinois Department of Corrections (DOC), related to the October 18, 2015, incident involving the strangulation of Jennifer Williams; (6) an information setting forth the charges and grand jury bill of indictment for aggravated battery related to the November 17, 2015, incident involving the alleged strangulation of Wade Wyciskalla; and (7) family photos of S.T. with Sarah and Kody. The court also admitted Michael's exhibits A through E, consisting of (1) photos of Michael and S.T., (2) Michael's DOC phone records from May 2016 to February 2018, (3) books and notes to S.T. from Michael, (4) pictures and notes created by Michael for S.T., and (5) notes and letters from S.T. to Michael. Six witnesses testified during the fitness portion of the trial.

¶ 12                              A. Testimony of Leanna Bennett

¶ 13    Leanna Bennett was a lifelong childhood friend of Sarah. Leanna confirmed that she was also Sarah's friend when Michael and Sarah were together in the spring and summer of 2012, following the birth of S.T. During that time, Leanna was concerned for Sarah and S.T. because Michael sent messages to Sarah that threatened to kill Sarah and her family. Leanna stated she and Sarah were scared after Sarah received the message and hid at Leanna's grandmother's house because Michael did not know the location of that home. Leanna stated she was afraid of Michael and believed Sarah was "completely scared" of him.

¶ 14                              B. Testimony of Jennifer Williams

¶ 15    Jennifer Williams testified that she began dating Michael in 2014, after he and Sarah broke up. Their first fight occurred in the summer of 2015 when Michael was having a party at his mother's house. Jennifer stated that Michael and others at the party were doing bath salts in the bathroom. When they came out, Michael climbed to the top of a pole barn outside the house and looked at his phone, which contained pictures of S.T. that were recently taken. Jennifer stated that Michael became angry, threw his phone down, and shattered the phone. He then disappeared into the house, punched his bathroom mirror, and shattered it everywhere. Jennifer said there was blood on his wrist and hand, and she was freaking out trying to clean it and calm him down. Thereafter, everybody left except one of Michael's friends who was sleeping on the couch. Michael was in bed, and Jennifer was still up drinking. She tried to wake Michael up to drink with her, but he got angry and chased her through the house. Jennifer begged Michael's friend to wake up and help her, but he could not help her. Jennifer stated that Michael chased

_____
    [2]The final two days of the hearing, January 19, 2021, and February 23, 2021, involved testimony regarding the best interest of S.T. As the trial court's findings on this issue were not raised on appeal, the testimony from the hearings on those days is not addressed.

her off the front porch and then pushed her. She fell and hit her head on the back steps. She then got up and Michael chased her about 100 yards through the front yard. Michael caught her, pushed her onto a piece of wood, and began to strangle and smack her. Jennifer stated that once she was able to get away from Michael, she ran away and hid in a ditch. Michael tried to follow her in his mother's vehicle, but she stayed hidden. Jennifer remembered hiding, soaking wet from urinating herself when he strangled her, and being cold in the ditch, waiting for him to go away. Once she no longer saw Michael, she left the premises by walking down a railroad track. She was eventually picked up by a policeman who asked if she had been abused that night. She was so scared that she did not tell him what happened and just told him she wanted to go home. The policeman took her home. Jennifer stated that she broke up with Michael and tried not to speak to Michael.

¶ 16    About a month after the incident, Jennifer woke up to a "peace offering" cell phone on her front porch. She stated this was Michael's way of luring her back in because he knew she lost her phone. She accepted the peace offering, and they resumed their relationship. Michael convinced her that he was not doing drugs anymore, but then he started acting crazy again. Jennifer remembered going to Michael's friend's house where Michael and the friend had a glass pipe out and were smoking from it in the bedroom. She did not know if it was methamphetamine or bath salts but was upset that Michael was doing drugs again.

¶ 17    On a different day, Jennifer saw a message on Michael's phone to another woman telling her she was beautiful. Jennifer told Michael to take her home and that she did not want to see him anymore. Jennifer stated that Michael took her home, driving 90 to 100 miles per hour all the way back for the 20 miles from his house to hers. She testified that she screamed at Michael to slow down and told him she was scared, but he did not slow down.

¶ 18    Jennifer stated that the relationship ended on October 18, 2015. She agreed to attend a wedding reception with Michael because he was afraid to go alone because Sarah would be there. They attended the reception for about 30 minutes and then left. Following the reception, Michael drove to unfamiliar area and left Jennifer in the car for two hours. When he came out he was different, erratic, and jittery. Michael asked her if she wanted to go home, and she said yes. She also told Michael that she was done with him and wanted to move forward in a different relationship. Michael could not handle the response and got angry. Michael proceeded to beat Jennifer, breaking every bone in her face except for her forehead. He also ripped off her clothes, cut her behind her ear, stabbed her twice underneath her neck, bit her breast, and strangled her. He then left her naked, in 28-degree weather, in her ex-boyfriend's yard. Jennifer was hospitalized in the intensive care unit in St. Louis for over a month. She had a tracheostomy and was on a ventilator throughout her stay in the hospital due to the damage to her throat from the beating and strangulation. She was released after five weeks in the hospital. Jennifer stated that Michael was originally facing Class X felony charges from the attack. She did not know what happened, but the charges were dropped to a Class 2 felony, and Michael was sent to prison.

¶ 19    Jennifer testified that after Michael went to prison, he tried to contact her. The first time was about a week after she got out of the hospital. Michael called her old cell phone number from the jail. She did not answer and called the jail to tell them Michael was going against his no contact order. They said they would remind Michael not to call her again and that was it. The second time he called was November 1, 2017. She had a new cell phone number and tried to keep it private; however, Michael was able to get it while he was in prison. Once she realized

it was him, she hung up. Michael called back again later, and Jennifer's fiancé told Michael to quit calling her. Michael kept calling, and Jennifer blocked the number. Jennifer called her mother who called the jail and told Michael to never contact Jennifer again. Jennifer also had a blocked voicemail from the number in which Michael claimed that they were still madly in love.

¶ 20 Jennifer stated that anybody in prison for trying to kill someone and thinking there was still some kind of connection was "sick." Jennifer stated she did not believe that Michael had learned a lesson at all. She stated that she stayed in the relationship because Michael manipulated her into thinking he was something different than what he was. He would pretend like he cared and act like he was nice; however, they were "very brief moments." The only emotion Michael ever showed was anger. Jennifer stated that she thought Michael had an issue that was way worse than drugs and it was called anger. She thought that anger was his demon, and that it could not be fixed barring a miracle.

¶ 21 Jennifer stated that from the beginning of their relationship in 2014 to the end in October 2015, Michael rarely took his parenting time with S.T. She stated that Michael spent most of his time partying or with her. When Jennifer did see Michael with S.T., it was at Regina's house and Jennifer mostly spent time with S.T. Michael was either sleeping or doing something else, but he never really spent time with S.T. during their entire relationship.

¶ 22 Jennifer stated that the first time she ever met S.T. was at Michael's mother's house before a trip to the water park. Michael really did not spend any time with S.T. on that trip and instead S.T. spent most of her time with Regina and Jennifer. Jennifer testified that it was like that every time she was with Michael and S.T. Jennifer stated that she would be the one taking care of S.T., playing with her, and entertaining her. When S.T. would crawl on Michael to try to get him to play with her and her toys, Michael would say something like, "Get off of me. I'm trying to sleep. You know, Jen, would you please take her and play with her?" So, Jennifer and S.T. would go outside and play. Jennifer stated that the only job Michael had at the time was "under the table business." Mostly he was partying and drinking at night, which made him tired. Michael would not take care of his daughter when he had her.

¶ 23 C. Testimony of Jo Ellen McKinney

¶ 24 Jo Ellen McKinney was Sarah's mother and S.T.'s grandmother. She stated that Sarah and Michael's relationship started in 2011 and, by 2012, Sarah was pregnant. Jo Ellen did not know when the relationship ended because it was off and on. Before S.T. was born, Jo Ellen would be around Sarah and Michael together. She stated that Michael did not like to be at her house because he did not have control over Sarah there. Michael was always trying to get Sarah to leave. Over time, Jo Ellen started noticing a change in Sarah. She stated Sarah was always a very confident, outgoing leader but became withdrawn by the end of 2011. Jo Ellen also started seeing suspicious bruising in late 2011 on Sarah's neck and her arms. When Jo Ellen first asked Sarah about them, she did not say they came from Michael. Several weeks later, Sarah changed her story and told Jo Ellen that she and Michael had gotten into a fight.

¶ 25 Jo Ellen stated that she also saw bruises on Sarah both when Sarah was pregnant and after S.T. was born. One time, when Sarah was far along in the pregnancy in the summer of 2012, there was a situation at Michael's house. Jo Ellen saw bruising on Sarah's neck and asked Sarah about it. Sarah stated that she and Michael got into an argument.

¶ 26    After S.T. was born, Sarah and S.T. lived with Jo Ellen and her husband, except for one week. During the first three months, Michael did not see S.T. very often. He saw her about one time every one to two weeks. Then Sarah went to live with Michael. After a week of living with Michael, Sarah and S.T. moved back in with Jo Ellen and her husband. Sarah and S.T. continued to live at Jo Ellen's house until S.T. was 2½ years old. Thereafter, Sarah and S.T. moved in with Sarah's dad, and later Sarah and Kody got together. During the period when Sarah and S.T. lived with Jo Ellen, Michael had court-ordered supervised visitation at Jo Ellen's house. She stated that Michael was not very active during parenting time and sometimes would not even show up. She stated that when Michael did show up, he would sleep on the floor with S.T. and looked hung over from the night before. Jo Ellen confirmed that, after the first parenting time order was issued, Michael never had unsupervised parenting time with S.T.

¶ 27    Jo Ellen stated that due to Michael's previous threats, Sarah would call her when she was leaving work or school. Jo Ellen testified that Michael threatened to run Sarah off the road and kill her or wait for her after work. People would have to walk Sarah out after work. In December 2012, Jo Ellen had S.T. at her house and was waiting for Sarah to get home. Sarah drove up the driveway, and thereafter, Jo Ellen heard a loud truck coming up the driveway. She then heard screaming and saw Sarah in her car with the doors locked. Michael was there punching the driver's side window of Sarah's car, calling her profane names, and saying he was going to kill her. When Jo Ellen's husband got to the door, Michael sped down the driveway, burned his tires, lost control of the truck, tore up the neighbor's yard, went across the road, and almost hit a telephone pole before he got the vehicle under control. Jo Ellen confirmed that she heard Michael threaten to kill Sarah and believed he meant it. She stated that Michael told Sarah multiple times that he was going to come to the house and kill her and then he showed up stating the same.

¶ 28                                    D. Testimony of Sarah R.

¶ 29    Sarah is S.T.'s biological mother and confirmed that Michael was S.T.'s biological father. At the time of the hearing, S.T. was seven years old. Sarah stated that her relationship with Michael began in late August or early September in 2011. They broke up a lot during the relationship but officially broke up when S.T. was around four months old, in either January or February of 2013.

¶ 30    Sarah was familiar with the names of Michael's prior girlfriends and confirmed Jamie Maxey was an ex-girlfriend. Sarah stated she was with Michael for about three months when she became pregnant. During those three months, Sarah admitted to using illicit drugs with Michael. She stopped after she found out she was pregnant. However, Michael did not. During this same time, Michael started being verbally abusive, controlling, and paranoid. She stated these instances occurred both when Michael was and was not using the drugs. The physical abuse started with him grabbing her wrist too hard or pulling her. Sarah stated that Michael talked to her about watching his parents and told her that his dad was abusive towards his mom when he was growing up. Sarah said that was kind of a red flag, but she was young and naïve and continued the relationship. Sarah testified that the abuse escalated once she was pregnant, stating there were countless times when Michael choked her. The first time was early in the pregnancy and it was cold outside. They were in Regina's front yard, and Sarah remembered Michael had her on the ground choking her and she was seeing spots. She was trying to get

him to stop, and eventually he did. After that, it happened quite a bit. Sometimes, Michael would take his hand and push Sarah's face down into the ground. These incidents occurred when Michael was mad at her, trying to prove his point, or claiming that she cheated on him.

¶ 31    Sarah stated that she would have bruises on her face a lot but got pretty good at concealing them. She also confirmed the threat she received when she was with Leanna in the summer of 2012. Sarah believed Michael would follow through on his threats because of all the times he was abusive. She said there were numerous times she thought Michael was really going to kill her and stated one of worst was when she was seven or eight months pregnant in the summer or early fall of 2012. Sarah could not remember why Michael was mad, but she was at Regina's house in the afternoon. Michael chased Sarah through the house, and she thought he was going to hurt her. She ran to Michael's room and locked the door because she could not get out of the house. Michael started kicking in his door and Sarah hid in the closet. He eventually kicked the wood door apart and then started throwing the pieces of wood at her.

¶ 32    Sarah stated another incident occurred earlier in her pregnancy at Regina's house. Michael was mad and Sarah told him she was leaving because she was not going to listen to him yell at her and accuse her of being with other guys. Sarah got in her car and locked the doors. As she was getting ready to leave, Michael came outside and started kicking the side of her car with his boot and knocked the rearview mirror off. When she got the car started and was getting ready to pull out of his driveway, Michael ran to the pole barn and grabbed a flat-headed "mallet or sledgehammer looking thing" and started running with it towards Sarah's car. Sarah stated there was a lot of damage to her car and she had to get a new car.

¶ 33    Sarah stated there was also a time late in her pregnancy, in the late summer of 2012, when she spent the night at Regina's house. Michael came home, woke Sarah up, and was trying to go through Sarah's phone, which was passcode protected. Michael accused her of talking to other guys and had her on the floor trying to choke her. Sarah testified that Michael's parents had to pull him off her. Then Michael and his dad went to the living room and got into a fight. Michael's mom was yelling, and when Sarah left to get in her car, Michael's dad was on the living room floor. Sarah confirmed that Michael's preferred abuse was to choke her. She could not remember how many times he choked her during the 2½ years they were together.

¶ 34    Sarah stated that she went into labor while at her mom's house on September 21, 2012. Sarah called Michael on the way to the hospital, and he told her to "shut the 'F' up" and sounded drunk. Sarah had the baby around 4 p.m. The hospital presented Sarah and Michael with paperwork acknowledging Michael's paternity. Sarah said they had discussed it months before because Michael said he did not even know if this was his baby. At the hospital, Michael did not want to sign the paper, and Sarah had to beg him to sign it.

¶ 35    After she left the hospital, Sarah went back to living with her mom. She stated that Michael's parenting time was sporadic; there would be some weeks when he would see S.T. three days and there were a lot of weeks when he would see her only one day. During the first four months, Michael was still taking pills and continued to choke Sarah when he was mad. She confirmed that Michael was never left alone with S.T. at that time.

¶ 36    When S.T. was two or three months old, Michael and Sarah were at Regina's house when Michael told Sarah not to let the dog in the house because her paws were muddy. Sarah went outside to get something for the baby, and when she came back in the dog got between her legs, came into the house, and got the carpet muddy. Sarah stated that Michael freaked out, pushed her, and locked her out of the house. Sarah stated that Regina's living room window

faced the road, so Sarah could see Michael in the living room. He was throwing S.T.'s toys through the living room window and eventually broke the living room window. Sarah stated that after the window broke Michael kind of cooled down and let Sarah back in. When Sarah went to check on S.T. to make sure she was okay because she was close to the window when it was broken, Michael went into the kitchen and threw his phone through the kitchen window, breaking it as well.

¶ 37     Sarah stated that she requested an order of protection when S.T. was about six months old because she did not want her daughter to see these things and Sarah was afraid they were going to be hurt. Sarah testified about Michael being mad and driving 110 miles per hour with both she and S.T. in the car when S.T. was about three months old. Sarah also testified that when S.T. was about four months old, Sarah left S.T. with Regina while she and Michael went for a drive. At that time, Sarah told Michael that she could not be in the relationship anymore. Michael was pretty upset and was talking about killing himself. As Sarah was getting S.T. into her car seat, she heard Regina screaming, "No, Michael." When Sarah came around the living room she saw Michael in his room, sitting on his bed with a shotgun under his chin. Regina was crying. Sarah was afraid that if Michael saw them he would turn the gun on them, so she ran upstairs and stayed in his brother's bedroom. She could still hear Regina screaming downstairs, and it seemed like forever, but finally, Michael's dad came upstairs and escorted them to her car so they could leave. As Sarah was leaving, she saw Michael still had the shotgun underneath his chin. After that incident, she filed for the order of protection, which was granted.

¶ 38     Sarah stated that the last time S.T. saw Michael was when he went to jail in 2015. S.T. was 2½ years old; she is now 7 years old. Since Michael's incarceration, Sarah received one letter from Michael in 2017. The letter was directed to Sarah and, at the end, it said something about beating up a guy in jail, which was around the same time that Michael attempted to choke another inmate (Wyciskalla). The only thing the letter said about S.T. was "Tell [S.T.] I love her." She did not know if he had her current address but stated she knew Michael's mother, grandmother, and aunts had the address because she would receive things from them in the mail. Sarah confirmed that she had not received anything else from Michael and stated Michael's mom did not forward any letters sent from Michael to S.T.

¶ 39     Sarah also received a phone call from Michael in February 2019, which she did not answer. She confirmed that the call did not occur until after she filed the petition for adoption. She further stated that her phone number had not changed since her relationship with Michael ended.

¶ 40     Sarah confirmed the relationship ended on the day Michael put a gun to his head in the winter of 2012. She stated that she never called police because there were 7 to 10 occasions when Michael would smash her phone before she could call anybody. When she got away she never called because she was 18, young, and stupid. She thought he would change, so she kept returning to the relationship.

¶ 41     Sarah stated that Michael eventually ended up in the Franklin County jail and later the Jefferson County jail in 2015. He was currently in the DOC. Prior to 2015, they had a family law case in Franklin County. Sarah stated she did not want to give Michael parenting time because she was afraid that S.T. would be in danger, but the judge ordered supervised visitation. The first year the visits were with Sarah's mom, the second year they were with Michael's mom. S.T. told Sarah that sometimes Michael called from jail when she was with

Regina. After Michael went to DOC in March 2016, Sarah continued to let Regina see S.T. on a regular basis but ended that around February 2018. Sarah stopped allowing Regina visitation because Sarah thought it was not in S.T.'s best interest to be involved with that family anymore, as Regina did not see a problem with Michael's behavior towards women and enabled his behavior because she did not think Michael's behavior was wrong. Sarah knew Regina had protective orders from Michael's dad, and she did not want S.T. to think it was okay for women to be abused. When Sarah talked to Regina about Michael's violence, Regina brushed it off like it was the woman's fault.

¶ 42      Sarah stated that S.T. remembered Michael's name when she was 2½ to 3 years old, but by the time she was 3½ to 4, S.T. never mentioned him. Sarah confirmed that she never took S.T. to visit Michael in jail or prison and did not encourage S.T. to send correspondence to Michael while he was incarcerated.

¶ 43                         E. Testimony of Regina Tinsley

¶ 44      Regina Tinsley is Michael's mother and S.T.'s grandmother. Her testimony addressed Michael's younger years including high school, extracurricular activities, and attendance at Rend Lake Community College (Rend Lake) for welding. She stated that, until the age of 19, Michael was never involved with law enforcement or under investigation and she never had issues with his temper while he lived with her. She was unaware of any incidents of violence or his use of drugs or alcohol when he was in high school.

¶ 45      Regina classified Michael's relationship with Sarah as "rocky." She stated that after S.T. was born, the March 2013 order of protection included both Sarah and S.T. At some point, Michael filed a request for joint custody in the family proceedings because he wanted to keep his rights to his child. Regina talked about the activities Michael and S.T. would do while at home, the park, or on trips. Regina identified the letters that S.T. sent Michael and Michael's recording sent to Regina's house for S.T., as well as other books Michael sent for S.T. at Regina's house. She stated that she talked to Michael every day and S.T. was brought up nearly every time she talked to him. She stated that she knew Michael still loved his daughter, missed her, and wished things were different so he could still have contact with S.T. Regina did not know when she last spoke to Sarah because her phone number and Facebook posts were blocked.

¶ 46      Regina admitted that she was abused by her husband and that Michael probably did see them arguing and fighting on more than one occasion. She did not know if he ever saw the physical violence. She agreed that Sarah and Michael broke up in February 2013 and the order of protection was filed in March 2013. When the order was issued, Michael was seeing S.T. two to three times a month. Regina stated she did not know how the living room window got broken and was not there when it happened. She also did not remember any incident when Michael held a gun to his head or that her ex-husband had to get Sarah and S.T. out of the house. She was not going to say that it did not happen, but she could not remember it. She agreed that she had an issue with her memory. She did not know if Michael exercised all his parenting time with S.T. and agreed that from September 2013 to October 2015, Michael never had unsupervised visitation with S.T. Regina stated that she never saw Michael choke Sarah although she did remember him grabbing Sarah by her arms at the front door. She thought she recalled Michael on top of Sarah and her ex-husband having to pull Michael off Sarah. She remembered everybody was yelling and agreed it was when Sarah was pregnant. Regina

discussed the physical abuse by her ex-husband and stated she believed he was a functioning alcoholic. She agreed that she divorced him seven years earlier but that he still lived with her. She stated that she assumed Michael would also live with her once he was released.

¶ 47                                        F. Testimony of Michael T.

¶ 48         At the time of the hearing, Michael was an inmate at Centralia DOC due to be released in September 2021. He stated he had no discipline issues when he was in high school, during which time he was involved in basketball, baseball, football, and band. He graduated high school in 2008 with a B/C grade average and received a scholarship to study welding at Rend Lake. Upon receiving his welding certificate, he began working at Lays Mining and worked there, off and on, between 2008 and 2013. Making money caused problems in his life and he started dabbling in drugs and alcohol. He admitted using opiates, pot, and bath salts from 2008 to October 2015. They affected his ability to properly perform his job. He tried to stop but suffered withdrawal. He stated his personality changed when he was on drugs, stating that when he had drugs, he was fine, but when he did not, there was a problem which led to short-temperedness. Prior to using those substances, he did not have an anger or a short-temperedness problem.

¶ 49         Michael was arrested in October 2015 and had no access to pills thereafter. He stated the first month was "kind of hard" but, thereafter, things were fine. He was a lot happier and had been clean since he was incarcerated. He did get into trouble once while incarcerated when he got in a fight with a kid in the county jail. Michael said the kid attacked him and they got into a scuffle. Michael stated that he was originally incarcerated in Taylorville, was there for 2½ to 3 years, and received no discipline reports while he was there. He moved to Centralia in December 2018 and received no discipline reports there either. While incarcerated, he learned trade skill jobs including barbering, locksmithing, and electric work. He also painted. He stated that he worked in the maintenance department of the prison doing electrical work from 8 a.m. to 2 p.m. and after that he mostly painted and got ready for bed.

¶ 50         Michael has one child, S.T., and stated he was with her daily in the beginning because he and Sarah were still together. He disagreed with Sarah's testimony that he did not participate in S.T.'s life. He stated he could not be with S.T. all the time due to court proceedings, and he could not just go pick her up for visitation. He stated he participated in changing diapers, feeding, burping, putting S.T. to bed, and assisted financially in the early years by buying clothes. After Sarah obtained the order of protection, he was denied access to S.T. He then filed paperwork to get visitation and was granted parenting time twice a week. He exercised his parenting time until he was incarcerated in October 2015.

¶ 51         Michael stated he had phone calls with his daughter from October 2015 to March 2016 when he was in the Jefferson County jail. These happened any time his mother had S.T., which was quite often, sometimes, two or three times a week. S.T. was 3½ years old at the time and could speak well for how young she was. S.T. would tell him what she was doing with his mom that day or what they were eating.

¶ 52         After Michael went to prison, he would contact S.T. by phone and write her letters. He talked to S.T. on the phone about two or three times a month. He was no longer able to have phone conversations with S.T. beginning in 2018 when he was served with the adoption papers. Michael identified the correspondence he sent to S.T. when he was incarcerated. Michael stated that he planned to get his life back on track when he was released from prison and stated he

would make a lot better choices now than he did five years ago. His hope for S.T. was that "she would have a good life, the both of them."

¶ 53  Michael admitted that he never had unsupervised parenting time with S.T. and disagreed that there was domestic violence in his house as a child. He stated he never witnessed his father physically assault his mother. He stated the violence just came out of nowhere when he started doing the drugs and the drugs made him do it. Michael admitted that he was charged with aggravated battery for choking a man in the Jefferson County jail in 2015. He also admitted that he was transferred from the Taylorville prison to the Centralia prison because he was in a fight. He agreed he was not doing drugs while incarcerated.

¶ 54  Michael agreed that his only attempts to contact S.T. were through his mother even though S.T. was living with Sarah and did not live with his mother. He further agreed that he had Sarah's telephone number and never attempted to call her except once in February 2019. He stated that he did not put Sarah's number on the phone list until that time. He testified that he made all his child support payments but later admitted that his mother paid his child support while he was incarcerated.

¶ 55  On November 17, 2020, following closing arguments on the issue of fitness, the trial court found that Michael's unfitness was proven by clear and convincing evidence as to depravity and failure to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare. Following two more days of testimony and argument, the trial court found that it was in the best interest of S.T. for Michael's parental rights to be terminated.

¶ 56  On March 2, 2021, the trial court issued a judgment of adoption that found Michael was unfit due to a failure to maintain a reasonable degree of interest, concern, or responsibility for the minor child's welfare. The court found that Michael made some efforts as was demonstrated by respondent's exhibits, but some was not enough, and Michael's efforts had to be reasonable. The court found that, prior to incarceration, Michael visited the child sporadically and, following incarceration, Michael wrote the minor child inconsistently and only sent correspondence to his mother's residence. The trial court also found that Michael was unfit due to depravity, stating that Michael was violent. The trial court addressed Michael's repeated abuse of Sarah, some of which occurred in the presence of the minor child, as well as Michael's repeated abuse of Jennifer, noting that he broke every bone in Jennifer's face, stabbed her in the neck, and was ordered not to contact her, yet he did. The trial court found that Michael showed absolutely no remorse for his actions and disagreed with Michael's argument that substance abuse was the reason for his violent actions. Given Michael's criminal history, violent nature, and lack of remorse, the court found Michael to be depraved and, as such, an unfit person. The court did not find Michael was unfit based on his child support payments, noting that Michael was in prison and his mother made some payments towards the child support obligations and found the payments were sufficient to find that Michael was not an unfit person for failure to support S.T. The trial court's judgment found it was in S.T.'s best interest to terminate Michael's parental rights, granted the petition for adoption, and changed the minor child's last name. Thereafter, Michael timely appealed.

¶ 57                                        II. ANALYSIS

¶ 58  On appeal, Michael argues that the trial court erred in finding him unfit because the findings were not supported by clear and convincing evidence for either depravity or a failure to maintain a reasonable degree of interest, concern, or responsibility for the minor child's

welfare under sections 1(D)(b) and 1(D)(i) of the Adoption Act (750 ILCS 50/1(D)(b), (i) (West 2018)). Michael contends that his efforts to be a part of S.T.'s life were sufficient because impediments restricting his access to the minor child were beyond his control. Michael further argues that although he has a criminal history based on conduct that was not admirable, his conduct did not rise to the level of depravity.

¶ 59    Our courts recognize that parental rights and responsibilities are of deep importance and should not be terminated lightly. *In re K.B.*, 314 Ill. App. 3d 739, 748 (2000). To terminate parental rights in a proceeding commenced under the Adoption Act (750 ILCS 50/1(D) (West 2018)), the trial court must first find that the parent is unfit. *In re M.M.*, 156 Ill. 2d 53, 61 (1993). On appeal, the trial court's findings are afforded great deference since it had the opportunity to view the witnesses and evaluate the testimony. *In re L.L.S.*, 218 Ill. App. 3d 444, 458 (1991). As such, the finding of unfitness will not be disturbed unless it is against the manifest weight of the evidence. *In re R.L.*, 352 Ill. App. 3d 985, 998 (2004). A finding is against the manifest weight of the evidence "if the opposite conclusion is clearly evident [citation] or the determination is unreasonable, arbitrary, or not based on the evidence." *In re D.F.*, 201 Ill. 2d 476, 498 (2002). The reviewing court "will not reweigh the evidence or reassess the witnesses' credibility." *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001).

¶ 60                     A. Failure to Maintain a Reasonable Degree of Interest,
                                     Concern, or Responsibility

¶ 61    Section 1(D) of the Adoption Act states that an " '[u]nfit person' " is "any person whom the court shall find to be unfit to have a child" and provides statutory grounds for finding unfitness, which include a "[f]ailure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare." 750 ILCS 50/1(D)(b) (West 2018). "Because this language is in the disjunctive, any of these three elements may be considered on its own as a basis for unfitness: the failure to maintain a reasonable degree of interest *or* concern *or* responsibility as to the child's welfare." (Emphases in original.) *In re Konstantinos H.*, 387 Ill. App. 3d 192, 204 (2008). When examining the allegations, trial courts must focus on the parent's reasonable efforts, rather than success, and must consider any circumstances that hinder visits, communication, or a parent's ability to show interest in the minor child. *Id.* The court should examine the parent's conduct in the context of which it occurred, including difficulties with transportation, poverty, conduct of others that hinders visitation, and any motivation underlying the failure to visit. *In re Adoption of Syck*, 138 Ill. 2d 255, 278-79 (1990). When personal visits are impractical, the court considers whether a reasonable degree of interest, concern, or responsibility was shown through alternative communications or gifts provided to the child, "taking into account the frequency and nature of those contacts." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). Here, Michael argues that the trial court's finding that he failed to maintain a reasonable degree of interest, concern, and responsibility toward the minor child was against the manifest weight of the evidence because, just as in *Peyla v. Martin*, 40 Ill. App. 3d 373 (1976), the impediments were beyond his control.

¶ 62    In *Peyla*, the respondent was imprisoned shortly after getting married and conceiving a child. *Id.* at 374. Prior to the birth, he sent letters to his wife that initially were friendly but later were threatening after the relationship deteriorated. *Id.* Eventually, the wife stopped accepting the letters and filed for divorce. *Id.* Respondent was advised of the child's birth by relatives, and the wife permitted a short visit with the child during a three-day furlough. *Id.* Thereafter,

the wife obtained the divorce, and when respondent was paroled, the wife denied him visitation with the child and threatened to call the police. *Id.* A year later, the respondent returned, again requesting visitation with the child, but was denied access by the wife's new husband. *Id.*

¶ 63 The trial court in *Peyla* found that respondent was unfit due to abandonment and a failure to maintain a substantial degree of interest, concern, or responsibility for the child's welfare. *Id.* at 375. The trial court's finding was based on respondent's failure to become actively involved with the child during the 15 months he was out on parole, stating, " 'he could have done more to express interest in the child than he did, even though he had to satisfy the requirements of his parole officer.' " *Id.* Testimony from respondent's parole officer revealed the officer advised respondent not to pursue visitation with his child until after his parole ended and refused to give respondent travel permits to the county where the child was located. *Id.* at 376. The officer further testified that he saw respondent weekly, and respondent counted down the weeks until his parole would be up so he could pursue his rights to see his child. *Id.*

¶ 64 On appeal, the court vacated both findings of unfitness, stating respondent's actions could not be construed as an "intent to abandon." *Id.* The court reviewed *In re Taylor*, 30 Ill. App. 3d 906 (1975), which discussed cases in which an agency frustrated or denied the attempts of a parent to see their child and later claimed the parent was unfit for abandonment or failure to maintain an interest in the child and noted the *Taylor* court's discouragement of such actions. *Peyla*, 40 Ill. App. 3d at 377. The *Peyla* court expanded *Taylor* beyond "official acts [that] prevent a parent from maintaining contact with a child," to include admonitions by a parole officer and a refusal of travel permission. (Internal quotation marks omitted.) *Id.* at 377-78. After also considering facts that included respondent's previously returned letters, the wife's refusal to cash respondent's child support checks, and respondent's lack of financial resources to provide gifts to the minor child, the court found the trial court's finding that respondent failed to maintain a reasonable degree of interest, concern, or responsibility for the child was against the manifest weight of the evidence. *Id.*

¶ 65 While Michael claims his impediments are like those seen in *Peyla*, "[e]ach case concerning parental unfitness is *sui generis*, requiring close analysis of its individual facts; consequently, factual comparisons to other cases by reviewing courts are of little value." *In re Daphnie E.*, 368 Ill. App. 3d at 1064. Instead, we look to the evidence where the burden of presenting clear and convincing evidence is upon those who have petitioned for adoption of the child. *In re Adoption of Syck*, 138 Ill. 2d at 274. Here, the petitioners presented evidence of Michael's lack of interest, concern, and responsibility both prior to and after his incarceration.

¶ 66 Sarah testified that prior to his incarceration, Michael subjected her to physical abuse by repeatedly strangling and beating her, even while she was pregnant. Further, Jo Ellen and Jennifer testified that Michael frequently failed to exercise his parenting time rights. According to Jo Ellen, when Michael was present, he appeared hung over and would sleep during most of his time with S.T. This testimony was corroborated by Jennifer's testimony, which revealed Michael was equally unresponsive to S.T. when parenting time was at Regina's house, leaving Jennifer to play and care for the child during Michael's parenting time. Michael's lack of concern for the child's welfare was further shown by Sarah's testimony revealing Michael's violent tendencies exhibited by intentionally breaking windows near the child, abusing Sarah in the presence of the minor child, and driving over 100 miles per hour when Sarah and the minor child were in his vehicle.

- 14 -

¶ 67 Following Michael's incarceration in October 2015, which admittedly decreased his ability to spend time with S.T., the evidence revealed that Michael's only communication with S.T. was through his mother and not Sarah. The evidence further revealed that Michael's written communications to S.T., via his mother, were infrequent and sporadic, with Michael sending only 22 written communications to S.T. during the three-year period beginning in October 2015 and ending in 2018, despite no evidence revealing that Sarah returned the one written communication directed to her in 2015. While Sarah admitted that she never took S.T. to visit Michael while he was incarcerated, the record was devoid of any request by Michael to see or visit with S.T. while imprisoned. The record was equally devoid of any rationale to explain why Michael's written communications to S.T. were so limited.

¶ 68 Instead, Michael relies heavily on his oral communications with S.T., via his mother, and blames Sarah for Michael's inability to spend time with the child. However, such claims were countered by the GAL report which opined, after interviewing Michael, that his concern regarding the adoption seemed more centered around the fact that S.T. would not be able to see his mother than him. Michael's argument was further met with evidence revealing that Sarah's reticence in fostering a relationship between Michael and S.T. did not arise out of spite but stemmed from fear as a result of a well-documented history of physical abuse by Michael throughout the brief duration of the relationship that occurred both while Sarah was pregnant and after the child's birth. Where the evidence is in conflict, we defer to the trial court's disposition regarding factual findings and credibility assessments because the trial court is in the best position to make these determinations. *In re A.B.*, 308 Ill. App. 3d 227, 240 (1999). Here, we find the record contains sufficient evidence supporting the trial court's finding that Michael failed to maintain a reasonable degree of interest, concern, or responsibility toward S.T., both prior to and after he was incarcerated, and therefore, we affirm the trial court's finding.

¶ 69                                    B. Depravity

¶ 70 Our supreme court defined depravity as " 'an inherent deficiency of moral sense and rectitude.' " *Stalder v. Stone*, 412 Ill. 488, 498 (1952). To constitute depravity, the acts alleged must form a course of conduct of sufficient duration and repetition to establish a moral deficiency, along with an inability or unwillingness to conform to accepted morality. *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 22. In the absence of a rebuttable presumption, the trial court must closely scrutinize the evidence of the respondent's character and credibility to determine depravity. *Id.* As noted above, a trial court's finding of unfitness is afforded great deference and will not be disturbed unless it is against the manifest weight of the evidence because it has the best opportunity to view and evaluate the parties and their testimony. *In re D.F.*, 201 Ill. 2d at 498-99.

¶ 71 Here, Michael argues that although he has multiple prior criminal convictions, including one for aggravated domestic battery, his criminal past was insufficient to rise to a level of depravity, citing *In re Abdullah*, 85 Ill. 2d 300 (1981), which involved a murder charge and a sentence of incarceration substantially greater than seen in Michael's case. However, we again note that each parental unfitness case is *sui generis*, requiring close analysis of its individual facts rendering factual comparisons to other cases of little value. *In re T.D.*, 268 Ill. App. 3d 239, 245 (1994).

¶ 72 Here, the trial court found that Michael was violent and specifically noted Michael's abuse of Sarah and Jennifer. Indeed, the record supports a series of escalating violent and aggressive acts presented over an extended period. In late 2011, Michael entered a relationship with Sarah that escalated from verbal abuse to frequent strangulations, beatings, and death threats throughout Sarah's pregnancy and continued for six months after S.T.'s birth. After Sarah, Michael was in a relationship with Maxey in 2013 that resulted in a guilty plea for criminal damage to property and a no contact order regarding Maxey. Thereafter, Michael began a relationship with Jennifer which resulted in a guilty plea for battery following a September 7, 2014, incident that involved strangulation. In the summer of 2015, Michael chased, beat, and strangled Jennifer, who had to hide in a ditch until Michael stopped hunting for her. A few months later, on October 18, 2015, before dumping her naked body in a front yard, Michael beat, stabbed, and strangled Jennifer to such extent that every bone in her face, but her forehead, was broken, and she required medical treatment for almost a month in an intensive care unit which included a tracheostomy and placement on a ventilator. Two months later, while incarcerated at the Jefferson County jail, Michael was indicted for strangling a fellow inmate at the facility, and in December 2018, Michael was transferred from Taylorville to Centralia after fighting with an inmate at Taylorville.

¶ 73 While a criminal record of an individual is "highly persuasive" evidence of depravity, it is only one factor to be considered, along with "closely scrutiniz[ing]" the character and credibility of the person. *In re Sanders*, 77 Ill. App. 3d 78, 82 (1979). Here, the trial court found that Michael was depraved because he was "violent" and showed "absolutely no remorse for his actions." An opposite finding is not clearly evident from the record. The evidence sufficiently established a course of conduct of sufficient duration and repetition to establish a moral deficiency coupled with an inability or unwillingness to conform to accepted morality. As such, we affirm the trial court's finding that Michael was depraved and unfit.

¶ 74                                   III. CONCLUSION

¶ 75 For the reasons stated herein, we affirm the trial court's findings that Michael was unfit based on a failure to maintain reasonable interest, concern, or responsibility toward the minor child and depravity.

¶ 76 Affirmed.