NOTICE
Decision filed 10/08/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 230762-U

NO. 5-23-0762

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* DALTON J., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Massac County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No. 20-JA-18 |
| v. | ) | |
| | ) | |
| Evlinda J., | ) | Honorable |
| | ) | Cord Z. Wittig, |
| Respondent-Appellant). | ) | Judge, presiding. |

PRESIDING JUSTICE VAUGHAN delivered the judgment of the court.
Justices Barberis and Boie concurred in the judgment.

**ORDER**

¶ 1     *Held*: Counsel's motion to withdraw as respondent's appellate counsel is granted where no meritorious argument can be raised regarding the trial court's May 16, 2023, findings of unfitness or its September 1, 2023, order terminating respondent's parental rights.

¶ 2     Respondent, Evlinda J., appealed the trial court's September 1, 2023, order terminating her parental rights. On appeal, Evlinda's counsel filed a motion to withdraw as Evlinda's appellate counsel and a supporting memorandum, arguing that Evlinda's appeal presented no potentially meritorious issues for review. See *Anders v. California*, 386 U.S. 738 (1967). This court provided Evlinda ample opportunity to respond to counsel's motion; however, no response was provided. After considering the record and counsel's supporting memorandum, we grant counsel's motion

1

for leave to withdraw and affirm the trial court's May 16, 2023, findings of Evlinda's unfitness and September 1, 2023, order terminating Evlinda's parental rights.

¶ 3                                    I. BACKGROUND

¶ 4    Evlinda and Dallen[1] are the biological parents of Dalton, born April 13, 2012. On April 7, 2020, Dalton was removed from their custody. At the shelter care hearing, Stacy Hefner, a child protection specialist with the Illinois Department of Children and Family Services (DCFS), testified that DCFS received a hotline report alleging that a child was living in a camper where methamphetamine was being manufactured. Ms. Hefner called police officers to accompany her and investigate the situation at Evlinda and Dallen's camper in Brookport, Illinois, on April 7, 2020. Ms. Hefner stated that the inside of the camper smelled, and no utility service was seen. She stated that Evlinda denied entry into the camper to either confirm or deny the existence of the endangering environmental concerns, and when Dalton came out of the camper, he was very dirty. She stated that during the conversation Evlinda's speech was slurred, and her movements were impaired to such extent that Ms. Hefner believed Evlinda was intoxicated. Ms. Hefner testified that Dalton was never enrolled in school. Counsel was appointed for Dallen and Evlinda.

¶ 5    Evlinda advised the court that she did not have her teeth in when DCFS was at the camper, that she received monthly Social Security disability payments, and that her back muscle spasms interfered with her ability to stand and walk. Dallen and Evlinda also advised the court that they had been trying to move for the past nine months, but their lack of a vehicle, due to a prior accident, precluded their departure from Illinois. The trial court found probable cause and ordered at least two visits with the child each week.

---

[1]Dallen is not a party to this appeal. Information related to him included in this decision is provided solely for context in Evlinda's appeal.

2

¶ 6    On June 10, 2020, a Caritas Family Solutions (Caritas) status report was filed with the court. Evlinda participated in an integrated assessment and was recommended for services for substance abuse, domestic violence as a victim, and mental health. She was also required to ensure utilities were in the home, attend visitation, and participate in drug testing. Her visits with Dalton were held virtually. During the May 29, 2020, visit, staff believed Evlinda was intoxicated because she acted erratically. She rolled her eyes back in her head, was unable to keep her head up, continuously popped her jaw back and forth, and sucked on Dallen's chest. Out of six scheduled drug tests, Evlinda participated in one. The test results were positive for methamphetamine and amphetamine.

¶ 7    Dalton had few social skills, talked down to women, hated being outside, did not like being told "no," and only wanted to watch television and play video games. He had no fear of strangers and used the "n word" and other foul language in the foster home. His assessment revealed that he witnessed Dallen's domestic violence toward Evlinda, including choking and pulling a knife on her. Dallen would also spank Dalton with a belt that made him bleed when the buckle hit his skin. Dalton stated that the shower did not work in the camper and therefore he used a washcloth to bathe. He had not recently seen a doctor and had no vaccines after age four. He was taken to an optometrist who found vision problems that were over five years old.

¶ 8    The adjudicatory hearing was held on July 22, 2020. Testimony was provided by Ms. Hefner, Summer Clapp, an officer who accompanied Ms. Hefner to the parents' camper on April 7, 2020, and Kelsie Arp, a caseworker from Caritas. Their testimony addressed how Dalton came into care and information received thereafter. Evlinda testified about her medical condition and the camper's utilities. Following the hearing, the trial court found the State proved the minor was neglected. The trial court's adjudicatory order found Dalton was neglected because he suffered

3

from a lack of support, education, and remedial care pursuant to section 2-3(1)(a) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(a) (West 2020)) and in an environment injurious to his health pursuant to section 2-3(1)(b) of the Juvenile Court Act (*id.* § 2-3(1)(b)).

¶ 9    The August 11, 2020, Caritas dispositional report indicated that Dalton was placed in therapy to help him deal with his past trauma, was very smart, and was doing better with the foster family. The report indicated that Evlinda was only interested in participating in services if they were Christian-based services. The parents only missed one visit; however, during most visits, the parents talked to case aides more than Dalton. The report recommended the parents complete their service plans and a goal of return home in one year.

¶ 10    The dispositional hearing was held on September 23, 2020. Both parents agreed to the dispositional report recommendations but requested two hours with Dalton once a week instead of two one-hour sessions twice a week. The request was granted. The written dispositional order found Evlinda was unable to care for the minor child.

¶ 11    On November 17, 2020, Caritas filed the service plan issued by DCFS. The report noted that Dalton, who was eight years old, was doing well in school. He read at an eighth-grade level, was making friends, developing social skills, and growing more rounded in his education. He reported that he loved school and was happy to be where he was. He was also entering counseling. He was with a traditional foster family. When Dallen and Evlinda were assessed for drug and mental health services, both denied taking drugs or having mental health issues and therefore no services were recommended. The agency requested reassessment with accurate information being provided. Evlinda denied instances of domestic abuse and had not taken the domestic abuse assessment.

4

¶ 12    On December 8, 2020, DCFS filed a permanency hearing report. The report revealed that Evlinda had not yet agreed to a reassessment. She had 14 scheduled drug tests. She failed to appear for nine of the tests and tested positive for amphetamine or methamphetamine on four of the five tests for which she appeared. She blamed the positive drug test results on Dallen, stating that he "was using" and slipping it into her without her knowledge. Evlinda was not engaged in any domestic violence services although she reported increased domestic violence after Dalton was removed. She denied offers to take her to the women's shelter. While she regularly attended visits with Dalton, both she and Dallen would blame Dalton for his removal and claim that he lied to the caseworkers. This made it difficult for Dalton to communicate openly. Dalton became more distant in the foster home after the visits. He continued to do well in school. The agency requested psychological evaluations of both parents. A permanency hearing on December 16, 2020, revealed the parents were heating their camper with a toaster oven and hair dryers. The permanency goal remained the same.

¶ 13    On January 14, 2021, DCFS suspended the parents' visitation. Correspondence indicated the suspension was in Dalton's best interest and was due to the parents' failure to adhere to the visitation guidelines. Dalton exhibited increased verbal and physical aggression in the foster home following the visits and his counselor recommended suspension of the visits. A copy of the counselor's correspondence was attached to the agency's correspondence to the parents.

¶ 14    Caritas filed a permanency report on March 10, 2021. The parents were not reporting for drug testing and reportedly moved to Paducah, Kentucky, after their camper was impounded on March 5, 2021. Evlinda had not been reassessed and stated she was entering inpatient rehabilitation in Atlanta, Georgia. Evlinda was arrested on March 2, 2021, and appeared to be under the influence of drugs based on the police report. Drug use was also indicated based on a voicemail left by

Evlinda in which she claimed Dallen stole her Social Security money and left her. She also stated that Dallen was hallucinating that "people were hiding under the hotel bed and saying things to him." Evlinda was not engaged in domestic violence services. The parents continued to speak negatively to Dalton during visits and, upon the request of his counselor, visits were suspended. Dalton was doing much better while visits were suspended.

¶ 15    On April 16, 2021, the guardian *ad litem* (GAL) filed a petition to permanently suspend visitation. The petition indicated that Dalton was not doing well following visits with his parents and the visits were affecting his behavior. It also noted a statement from Evlinda during visitation that she needed to "eat her scabs because she is a vampire." On April 21, 2021, Evlinda's lawyer filed an objection arguing that the petition was based on the same letter from Dalton's counselor in January 2021, and the counselor may no longer feel that way. It further argued that the GAL was requesting permanent cessation as opposed to a suspension and claimed children regularly experienced divided loyalties between the biological and foster parents.

¶ 16    On May 15, 2021, Caritas filed a permanency report that indicated Evlinda was in a substance abuse facility in Atlanta and that mental health services were not provided at that facility. Evlinda was not participating in domestic violence services. The agency allowed three virtual visits, but Evlinda only appeared for one. After she missed the last two visits, Dalton stated that he no longer wanted visits with either parent. Dalton was now nine years old. He was participating in baseball, doing terrific in school, and interacting with the neighborhood children. His foster parents said Dalton was quiet and uncooperative during the three weeks that virtual visitation was reinstated. His behavior improved when the visits ceased.

¶ 17    At the permanency hearing on May 26, 2021, the court was advised that the case passed legal screening as to both parents on May 21, 2021. The court considered a goal change but, after

6

hearing arguments, did not change the goal and left visitation to the discretion of the agency. The court's June 9, 2021, permanency order found Evlinda made reasonable efforts but not reasonable progress.

¶ 18   Caritas filed a permanency report on September 16, 2021. The report revealed that Evlinda left the Atlanta inpatient facility against medical advice after two weeks. She was not enrolled in any services and an incident occurred in Carbondale, Illinois, on July 9, 2021, but no details were provided. Evlinda stated she was leaving Dallen and was requesting full custody of Dalton. She scheduled a visit with the caseworker in July but failed to appear. Two video visits took place. Dalton said he no longer wanted to attend parental visits. He was excelling in school, got his hair cut, and no longer wanted anything to do with his parents. He stated that he wanted his foster parents to adopt him. The agency recommended a change in permanency goal to substitute care pending determination of termination of parental rights. Updated correspondence from Dalton's counselor stated Dalton was doing better without biological parent visits and his nightmares and outbursts lessened when visits were suspended. Based on the counselor's letter, the agency again suspended visitation.

¶ 19   On December 15, 2021, the parents requested an *in camera* interview with Dalton due to correspondence from his counselor recommending cessation of visitation. The motion argued that Dalton was old enough to speak his own wishes to the court. On December 17, 2021, the trial court interviewed Dalton. During that interview, Dalton stated that he no longer wanted to visit with his parents and was glad they no longer lived in Illinois. He talked about their drug and alcohol use, as well as their physical abuse against each other, the grandparents, and him. A hearing was held on both the recommendation to change the permanency goal and discontinue visitation. Following the hearing, the court changed the permanency goal to substitute care pending determination of

termination of parental rights and discontinued visitation. The January 10, 2022, permanency order found that neither Evlinda, nor Dallen, made reasonable effort or responsible progress.

¶ 20    On May 25, 2022, a permanency hearing report was filed indicating that Evlinda was now participating in services. She was in mental health, substance abuse, and domestic violence classes. She completed her parenting classes; however, she and Dallen fought before and after the parenting classes. Evlinda's March 2022 drug test was negative. The parents remained a couple and were looking for Section 8 housing. Dalton was excelling at school, had made friends, and adamantly refused to attend visits with his parents. He stated that he wanted to stay with his foster family forever, and if he was returned to his parents, he would run away. The recommended goal change was for adoption

¶ 21    On May 27, 2022, the State filed a petition to terminate parental rights. With regard to Evlinda, the State alleged she was unfit for (1) failing to maintain a reasonable degree of interest, concern, or responsibility for the child's welfare pursuant to section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2022)); (2) failing to protect the child from conditions within her environment injurious to the child's welfare pursuant to section 1(D)(g) of the Adoption Act (*id.* § 1(D)(g)); and (3) failing to make reasonable efforts to correct the conditions that were the basis of the child's removal for any nine-month period following the adjudication of a neglected or abused child pursuant to section 1(D)(m)(i) of the Adoption Act (*id.* § 1(D)(m)(i)). At the hearing on May 27, 2022, the petition was read to the parents along with their rights under the Act. Both parents stated they understood what the State was alleging and their rights under the Act. The fitness hearing was scheduled for August 26, 2022.

¶ 22    The August 24, 2022, permanency report revealed that Evlinda was not participating in mental health or substance abuse services. She said she was taking online domestic violence

8

classes but had not signed the consent necessary to allow the agency to determine her status with the class. She completed the parenting class but had no housing. Dalton continued to refuse to attend visits. The last five scheduled drug tests revealed trace values of THC on March 25, 2022, negative for drugs on April 29, 2022, and failures to appear for the July 28 and August 17, 2022, testing dates. As to the last testing date, Evlinda told the agency she had no transportation to attend but that she had a psychological assessment appointment the same day. Dalton was 10 years old and in a potential adoptive placement. He had a positive relationship with the foster parents and his foster siblings. He and the foster family repeatedly stated that he wanted them to adopt him, and they wanted to adopt him. He continued to excel in school, had friends, and was involved in sports. He was in counseling that was proving beneficial and continued to make progress. The report noted the length of time the case was open and the lack of progress by the biological parents during that time. The agency recommended adoption once parental rights were terminated.

¶ 23    Due to a requested continuance by Dallen's counsel, the fitness hearing was held on October 28, 2022. The State filed a notice clarifying that its petition to terminate parental rights was based on the periods from July 23, 2020, through December 17, 2021, and December 18, 2021, through October 28, 2022. The dates were the same for both parents.

¶ 24    Constance Hernandez, a foster care supervisor for Caritas, testified that she became involved in Dalton's case approximately three months after he was removed from the home. She was the supervisor on the case for about a year before the hearing. She stated that the parents' services included obtaining a mental health assessment and completing any recommended treatment, obtaining a substance abuse assessment and completing any recommended treatment, participating in drug screens, engaging in parenting classes, engaging in domestic violence counseling, and finding and sustaining stable housing. They were also required to cooperate with

the agency. She explained why two mental health assessments were required for both parents due to their failure to provide true information and history at the initial assessment. Evlinda was not forthcoming on either the first or second mental health assessments and therefore had no recommendation for counseling. Both parents completed the substance abuse assessment but were not forthcoming based on the drug testing results that were received. The drug tests taken June 24, 2020, August 19, 2020, September 21, 2020, and November 16, 2020, were positive for methamphetamines for both parents. Based on those results, the agency recommended substance abuse treatment. Neither parent had completed that treatment either. The parents did participate in a drug screen in March 2022 but were inconsistent in returning from Tennessee to take additional tests. Trace amounts of THC were found in the March testing results and she noted that Tennessee was not a state that legalized marijuana. Evlinda's April 2022 drug testing was negative. Thereafter, Dallen's attorney objected on the basis of hearsay to Ms. Hernandez's testimony related to Dallen's drug testing, the parents' failure to appear for drug testing, and eventually, all the information in the Caritas permanency report. The court found the reports were inadmissible hearsay but stated it would allow the State to obtain an affidavit to satisfy the modified business record exception to the hearsay rule. The court continued the hearing until January 27, 2023. On January 25, 2023, the State moved for a continuance due to the unavailability of some of its witnesses. The motion was granted, and the fitness hearing was rescheduled for May 16, 2023.

¶ 25    On April 27, 2023, Caritas filed an updated DCFS family service plan. The report noted that the parents lived in Tennessee and would not sign consents that would allow the agency to verify service participation. Dalton was now 10 years old. He completed his counseling and was discharged successfully. No medical services beyond immunizations were necessary. He loved school, was making social connections, was a straight A student, and was reading at a ninth-grade

level. He was also participating in summer baseball, Boy Scouts, and band. He no longer called his biological parents "mom and dad." He spoke of them using their first names. He had a strong bond with his foster parents and foster siblings. Evlinda was reported as unsatisfactory for all the recommended services.

¶ 26    The fitness hearing resumed on May 16, 2023. The case was called three times. Dallen was in jail in Tennessee due to domestic assault and aggravated assault charges. Evlinda testified that she was the victim in both assaults, and she confirmed that the incidents occurred. She was trying to get the cases dismissed because she believed the issue "should be in God's hands, not the court's" hands. After denying Dallen's motion to continue the hearing, the court found Dallen in default and proceeded with the fitness hearing solely as to Evlinda.

¶ 27    The State recalled Constance Hernandez as a witness. She reiterated her previous testimony and advised that she left her employment with Caritas on January 26, 2023. During the time of her employment, the only service for which Evlinda was marked as "satisfactory" was cooperation with the agency, and that was only at the beginning of the case. Evlinda completed the domestic violence services; however, she returned to the perpetrator of the domestic violence. Visitation last occurred in September prior to the court issuing an order denying visitation in December. Multiple attempts were made to assist Evlinda in leaving her abuser, but she would not accept the assistance. Evlinda did leave Dallen and entered treatment in Georgia, but Dallen went to Georgia, and they reunited. She stated that Evlinda participated in the assessments but did not participate in the recommended services. She further explained that the underlying basis of the visitation termination was Dalton's fear of his father and his mother's acquiescence to the father's statements and behavior. Ms. Hernandez authored the report dated December 8, 2020, based on the six prior months. That report revealed that Evlinda tested positive for methamphetamines on four of the five

11

drug tests and did not engage in domestic violence services during that period. Ms. Hernandez also authored the March 19, 2021, report based on the six months prior. Evlinda had mental health and substance abuse assessments but did not participate in the recommended services for those issues. She refused to participate in drug testing and did not participate in any domestic violence services during that period. Ms. Hernandez also authored the May 25, 2022, permanency report, which was based on the previous six months. Evlinda was marked as unsatisfactory for every recommended service. Ms. Hernadez found Evlinda failed to make reasonable efforts or substantial progress during that period. The August 24, 2022, report revealed that Evlinda obtained a mental health assessment but did not follow through with the recommended services. Ms. Hernandez testified that during the three years the case was open, the parents were never stable enough to have Dalton returned.

¶ 28    The State called Marcus Clarry, the lead foster care manager at Caritas. He was Dalton's caseworker from August 2020 to May 2021. Mr. Clarry identified the service plans he authored that were dated June 9, 2020, and November 17, 2020. During those periods Evlinda was cooperative with the agency but failed to participate in any recommended services. The assessments were performed outside of the agency network to prevent the agency from providing underlying information related to the case. She was rated as unsatisfactory for all her services, except communicating with the agency. He stated that a domestic abuse incident occurred between Dallen and Evlinda in December 2020. An order of protection was obtained for Evlinda. She later bailed Dallen out of jail and they resumed living together. He stated that neither parent was compliant with the regularly scheduled drug testing and the camper only had electricity because an extension cord was running from the landlord's house. When Mr. Clarry visited the home in December, it was heated by curling irons and hair dryers hanging from the ceiling, and an open

12

toaster oven. Water was provided via a hookup from the landlord's house. The parents left Illinois after Dallen got out of jail and moved to Kentucky. They were in Atlanta, Georgia, when Mr. Clarry handed off the case. To his knowledge, they never returned to Illinois. Both parents were unsatisfactory with their services while he had the case and continued to live together. He was the caseworker from August 17, 2020, to May 17, 2021, and during that time neither parent made reasonable effort nor reasonable progress to correct the conditions for which Dalton was removed during that period. He stated that he offered to drive Evlinda to the Carbondale women's shelter, but she would not go. Evlinda told him that she would not leave Dallen because they had a dog together and most shelters would not allow the animal. However, Mr. Clarry stated that when he visited the camper, the dog was malnourished and slept in a cage with no hay outside in the winter. He did not believe the animal's well-being was a priority for Evlinda. The State asked the court to take judicial notice of its past orders and its interview with Dalton. Thereafter, the State rested.

¶ 29    Evlinda testified that she currently lived in Clarksville, Tennessee. She stated that they never cooked methamphetamine at the camper. She admitted doing drugs years ago and stated that her prior drug testing was previously thrown out by the preceding judge and her prior attorney. She stated that she gave advance notice to the agency where she would be having the assessments performed. None of her assessment results required her to perform services. She stated that she and Dallen had a great relationship until Dalton was taken. Thereafter, the relationship went downhill until Dallen ended up in jail and made death threats, and then, she was no longer with him. She stated they agreed to homeschool Dalton, and he was above the third-grade level when DCFS took him. She disputed Mr. Clarry's testimony that he offered to drive her to Carbondale to the women's shelter. She stated that she had no way to get to the women's shelter. She eventually secured a residence in Tennessee where she could perform her services. She was in the program

13

for six months, which was as long as she was allowed to stay without a child present. This was from July 2022 to January 2023. She stated that Caritas was aware of her residence at the facility. She testified that she planned to divorce Dallen and stated that jail was too good for him. She believed she made wonderful progress with her case. She stated Dallen mentally abused her, and it was his fault that she did not complete her services. She was currently living in a motel and paying for it with her Social Security check.

¶ 30    Following Evlinda's testimony and arguments by the parties, the trial court stated,

"The simple fact is that after [Dalton] was brought into care, his parents left him. His parents left him in Illinois; traveled to multiple states; traveled to states where it made it difficult for them to come back to Illinois to attend court dates; traveled to states where it made it nearly impossible, even though they were probably aware of it, to obtain services designed to reunify their family. There was no evidence that *** wasn't an intentional move on their part.

So[,] I do find the State has proved by clear and convincing evidence that respondent mother failed to maintain a reasonable degree of interest, concern, responsibility as to the child's welfare."

¶ 31    The court continued by stating,

"Harking back to what Dalton told me and testimony that I've heard at previous hearings, Dallen *** is an abuser. There is no doubt. He is a violent person. It's his way or the highway and I understand it's a cycle of violence; I do. You see it every day in this line of work. There were opportunities presented to remove herself from that situation. She didn't avail herself of those. So[,] I find that she did allow Dalton to remain in the presence of an abuser and she did fail to take

14

measures to protect him from serious harm. So[,] the State has proven by clear and convincing evidence that respondent mother failed to protect the child from conditions within his environment injurious to the child's welfare.

When I look subjectively at the actual efforts made by [Evlinda] to correct the conditions that required Dalton to be brough into care and consider whether that level of effort is reasonable given her circumstances, I note and totally understand that she is not a wealthy woman, has virtually been homeless throughout this whole process, probably a low support system. But the case has been open now for more than three years and not a lot, if anything, has been done. Hardly anything has been done to correct the conditions. She *** is living in hotels. The mental health hasn't been—she's got the assessments[,] but the treatment hasn't been complete, substance abuse hasn't been complete. I'm not certain if domestic violence was complete. She testified that she did complete a 24-week session. But that, that's so very minimal when looking at the fact that the case has been open for 37 months.

Her future plan, and I know it's tough. I believe it's tough. But her future plan is unrealistic. She is currently living in a hotel[,] and she is hoping to get with the church to get an apartment so that Dalton can have his own room. So[,] it's not anything definite at this point in time for him.

So[,] I do find the State has proven by clear and convincing evidence that respondent mother has failed to make reasonable efforts to correct the conditions that were the basis for the removal of the child form the parents during the nine-month period previously specified by the State. So[,] I do find that [Evlinda] is unfit to have the minor child."

15

Thereafter, the court set the case for a best interest hearing on June 30, 2023.

¶ 32    On June 16, 2023, Evlinda's attorney moved for reconsideration of the trial court's fitness findings based on a change in circumstances. Those circumstances included: (1) Evlinda's current residency in Illinois at the Beaumont Motel in Metropolis, Illinois; (2) her recent removal of Dallen as the payee of her Social Security checks; (3) her plan to divorce Dallen once she met the Illinois residency requirements; (4) her plan to find employment to supplement her Social Security income; and (5) her plan to apply for assistance from the Massac County Housing Authority which she was never able to do when she was with Dallen. Dallen also filed a motion for reconsideration and moved to continue the hearing. His motion to continue was granted and the best interest hearing, and the motions for reconsideration, were set for hearing on August 25, 2023.

¶ 33    On August 17, 2023, Caritas filed a status report. The agency had no contact with Evlinda since the May 16, 2023, hearing, and her last known address was in Tennessee. Dalton was now 11 years old and doing well with his foster family. He was excelling in school and blossomed while in foster care. He was outgoing, witty, and adventurous. He was in sixth grade and read at a ninth-grade level. He was discharged successfully from counseling. He enjoyed living with the foster family and repeatedly told caseworkers that he would like to be adopted by the foster family. He has also indicated that he has no desire to be in contact with either of his biological parents. He had been in foster care for 1233 days.

¶ 34    The best interest hearing was held on August 25, 2023. The court first addressed the two pending motions for reconsideration. Evlinda's attorney stated she had nothing to add to her motion because the parties had reconciled. Thereafter, the court denied Evlinda's motion for reconsideration. The court also denied Dallen's motion for reconsideration and moved to the best interest hearing.

16

¶ 35    The GAL provided an oral report based on his conversation with Dalton earlier that day at Dalton's school. The GAL stated everything remained the same as when the court spoke with him. Dalton's feelings had not changed regarding his parents, and he did not wish to have any contact with either parent, even when asked separately about each parent. He stated that he loved his foster family. He was currently in the sixth grade and doing great. He enjoyed his current homeroom teacher, and his favorite subject was science. He stated that he wanted his current foster family to adopt him. The GAL also spoke with the foster mother. She stated that she and the maternal grandparents had a great working relationship, and the grandparents saw Dalton every other week during the summer. They also saw him during holidays and every other weekend, which she believed was in Dalton's best interests. She further stated that if they were allowed to adopt Dalton, they would continue to foster that relationship, noting that the grandparents had a restraining order against Dallen. The grandparents also supported adoption by the foster family.

¶ 36    The State called Marcus Clarry as a witness who testified that Evlinda had not contacted the agency since the fitness hearing. He stated that while Evlinda's attorney stated that Evlinda completed services, no documentation supporting that claim was provided to his office. Mr. Clarry met with Dalton three times since the fitness hearing. Dalton was doing very well and was very intelligent. He was involved in his school activities. He loved science, math, and reading. He was very advanced with reading. He was also in the Boy Scouts. He tried baseball over the summer but did not enjoy it and preferred being in the wilderness with the Boy Scouts. He considered the foster family his family and had several friends at school. Mr. Clarry stated that the foster family provided shelter, clothing, and food for Dalton. They also maintained his doctors' appointments. Dalton had been with the foster family since July 2021. He was secure with the foster family, and they showed him great affection. He believed it was in Dalton's best interest for the foster family to adopt him.

17

On cross-examination, Mr. Clarry agreed that the foster family received a stipend from the State of Illinois because they were a licensed foster family. He did not know if Dalton received any money from his mother's disability checks because he was a dependent. He stated that he had seen Dalton's bedroom, and it contained a bed, clothes, and all his necessities. The foster mother stated she was open to Evlinda communicating with Dalton, but Dalton did not want to communicate with Evlinda or Dallen. He stated the foster family was ready to adopt Dalton as soon as it was able. Thereafter, the State rested.

¶ 37    Dallen's attorney called Evlinda as an adverse witness. She disputed Mr. Clarry's testimony regarding their efforts to contact the agency. She said she tried to obtain a picture of Dalton, but no one would return her call. She also contacted them to clarify the correct address so she could send presents to Dalton. She stated that she sent a $1000 VISA gift card for Dalton to Caritas in Carterville but did not know if it was ever given to him. She was unsure if she had a history of calls on her phone. Dallen interjected stating the calls would be there. She stated that she called the agency at least once a month. She received an inheritance and was using some of that money to send to Dalton. She did not know the current caseworker. She said she had the same phone number since May 2023 and had plenty of minutes on her phone if the agency called.

¶ 38    Dallen testified that he currently lived in Metropolis. He said he was present three times when Evlinda unsuccessfully tried to call the agency. He stated that Evlinda resided with him in Metropolis at Motel 6. They had been there a couple of days and were previously at the Super 8 for a couple months. He said he was in jail for approximately two weeks after the fitness hearing and then was released.

¶ 39    Following arguments, the court stated,

"The situation is that you were in the middle of a juvenile case, voluntarily moved to Tennessee. There were multiple residences, you were living in a camper, living in hotels, and that model of life has continued on to today. [Dallen] has been incarcerated repeatedly. In the Motion to Reconsider, you were living in the *** Baymont down by the river. Then you were at the Super 8, now Motel 6.

You know it's been argued that there was a lack of interest from the caseworkers, but *** [w]hen you cut out of the state in the middle of a juvenile case, it really hamstrings the agency.

***

There is *** no doubt that Dalton is a super smart kid. I've heard him talk. He was intelligent, precocious, and mature. And to me that means that I should just give what he wants and says even more weight, if he's able to intelligently state reasons why he wants to do something or not do something instead of just the typical answers you get from little kids, then his statement should be afforded more weight.

The case has been going on for 40 months now. He's been in care for 1,233 days, and there is still no light at the end of the tunnel for return home. It's just blackness at the end of that tunnel as I see it.

So[,] at this point in time Dalton is thriving. He's absolutely thriving and it's not just economic thriving but he's stable. He's in a loving home. He feels as if they are his family. They love him back.

19

> So[,] I do believe that the State has proven by a preponderance of the evidence that it's in Dalton's best interest that parental rights be terminated. So[,] the State's petition is granted."

Evlinda timely appealed.

¶ 40                                II. ANALYSIS

¶ 41    We must first address the delay in the issuance of this order. This case is subject to an expedited disposition pursuant to Illinois Supreme Court Rule 311(a)(5) (eff. July 1, 2018). Rule 311(a)(5) requires the appellate court to issue its decision within 150 days after the notice of appeal is filed, except for good cause shown. Here, the notice of appeal was filed on September 8, 2023, making our decision due by February 5, 2024. Although this court makes every effort to comply with the Rule 311(a)(5) deadline, respondent's initial appointed appellate counsel failed to file any brief despite this court's orders to do so. Due to appellate counsel's lack of compliance with this court's orders, alternative appellate counsel was appointed, and upon counsel's request, additional time was granted to file respondent's brief. Respondent's counsel filed an *Anders* brief requesting leave to withdraw as counsel, and therefore, additional time was granted to respondent to reply to the *Anders* brief. Accordingly, we find good cause exists for filing this decision beyond the deadline.

¶ 42    On appeal, respondent's counsel argues that no meritorious argument can be presented in support of Evlinda's appeal. Counsel argues that two issues were considered, but counsel found no support for the issues in the record. Those potential issues were the trial court's findings of unfitness and its termination of Evlinda's parental rights. We consider each potential issue.

¶ 43    Termination of parental rights proceedings are governed by the Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2022)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2022)).

20

After a petition for involuntary termination is filed under the Juvenile Court Act, a two-step process is required for parental rights termination. See 705 ILCS 405/2-29(2) (West 2022). "The State must first establish, by clear and convincing evidence, that the parent is an unfit person under one or more of the grounds of unfitness enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018))." *In re J.C.*, 2020 IL App (2d) 200063, ¶ 27.

¶ 44    "In order to reverse a trial court's finding that there was clear and convincing evidence of parental unfitness, the reviewing court must conclude that the trial court's finding was against the manifest weight of the evidence." *In re C.N.*, 196 Ill. 2d 181, 208 (2001). This occurs only when "the opposite conclusion is clearly apparent." *In re N.G.*, 2018 IL 121939, ¶ 29. "Where the evidence is in conflict, we defer to the trial court's disposition regarding factual findings and credibility assessments, because the trial court is in the best position to make these determinations." *In re S.T.*, 2021 IL App (5th) 210077, ¶ 68. Because each ground set forth in section 1(D) provides a discrete basis for a finding of unfitness, affirmation of any one of the grounds is sufficient to affirm the finding of unfitness. *In re C.W.*, 199 Ill. 2d 198, 217 (2002).

¶ 45    Here, the trial court found Evlinda unfit on all three grounds alleged by the State. The grounds were (1) a failure to maintain a reasonable degree of interest, concern, or responsibility as to Dalton's welfare; (2) failure to protect Dalton from conditions within his environment injurious to his welfare; and (3) and failure to make reasonable efforts to correct the conditions that were the basis of Dalton's removal during any nine-month period alleged by the State. See 750 ILCS 50/1(D)(b), (g), (m) (West 2022).

¶ 46    The first ground, *i.e.*, a failure to maintain a reasonable degree of interest, concern, or responsibility as to Dalton's welfare, contains disjunctive language and therefore any of these three elements may be considered the basis for unfitness. *In re Jaron Z.*, 348 Ill. App. 3d 239, 259

21

(2004). When examining allegations under this ground, the trial court must focus on the parent's reasonable efforts, as opposed to the parent's success. *Id.* More specifically, the court must consider any circumstances that made it difficult for the parent to visit, communicate with, or show interest in the child. *Id.* Noncompliance with a service plan is also considered for this ground. *Id.*

¶ 47 Here, respondent repeatedly showed a lack of interest in Dalton. When visitation was offered, she either failed to appear, or when she did appear, spent the time talking with case aides, berating Dalton for telling the agency the truth about his life with his parents, and/or would act in a manner that led the case aides to believe she was intoxicated. No evidence exists that indicate Evlinda sent cards or gifts to Dalton on his birthday or for holidays beyond an alleged gift card sent over three years after Dalton was removed from the home. The record is also replete with Evlinda's failure to comply with her service plan. Although assessments were taken, Evlinda never received the recommended mental health treatment. While she completed a parenting class, she fought with Dallen before and after each class.

¶ 48 As to domestic abuse, Evlinda declined offers of transportation to a women's shelter. While she contended that she did complete domestic violence treatment, no documentation was ever submitted in support of the claim because she refused to sign the consents that would allow the agency to monitor that progress. Further, even if she did complete the service, she continued to reside with Dallen after completing the service despite admitting, under oath, that she was, at least twice, the victim of his domestic abuse. The record also clearly established that Evlinda never had stable and suitable housing as required by her service plan.

¶ 49 Equally clear, as noted by the trial court, was the fact that after Dalton was taken into care, Evlinda left him in Illinois and traveled to Kentucky, Tennessee, and Georgia. Those actions made it difficult for her to appear in court or visit with Dalton and equally difficult for her to participate

22

in services offered by the agency that would assist her in completing her service plan that would allow her to reunite the family.

¶ 50    Given the record, we agree that no meritorious argument can be made regarding the trial court's finding of unfitness pursuant to section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2022)). The record fails to clearly demonstrate that the opposite result was proper which is required to show the trial court's findings were against the manifest weight of the evidence. *In re D.D.*, 196 Ill. 2d 405, 417 (2001). Clear and convincing evidence supporting a single ground for unfitness is sufficient to affirm the trial court's finding of unfitness. *Id.* at 422. Accordingly, we agree that no meritorious argument can be raised regarding the trial court's finding of unfitness.

¶ 51    After a trial court finds the parent unfit, the cause proceeds to the second step and the trial court determines whether it is in the best interest of the child to terminate parental rights. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1071 (2006). At this proceeding, the "issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphases in original.) *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The focus shifts to "the child's interest in a stable, loving home life." *Id.*

¶ 52    In reaching its best interest determination, the trial court must consider, in the context of the child's age and developmental needs, the following statutory factors:

"(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments, including love, security, familiarity, and continuity of affection, and the least-disruptive placement alternative; (5) the child's wishes; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parental figures

23

and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child." *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009).

Additional factors include " 'the nature and length of the child's relationship with the present caretaker' and the effect that a change in placement would have upon the emotional and psychological well-being of the child." *In re Austin W.*, 214 Ill. 2d 31, 50 (2005) (quoting *In re Violetta B.*, 210 Ill. App. 3d 521, 534 (1991)), *abrogated on other grounds by In re M.M.*, 2016 IL 119932, ¶ 31. "[N]o factor is dispositive." *In re Austin W.*, 214 Ill. 2d at 50. A court's best interest finding will not be reversed unless it is contrary to the manifest weight of the evidence. *In re Jay. H.*, 395 Ill. App. 3d at 1071.

¶ 53 On appeal, Evlinda's counsel argues that no meritorious argument exists regarding the trial court's finding that it was in the best interest of Dalton to terminate Evlinda's parental rights. We agree. While the trial court did not specifically address each of the statutory factors in either its oral pronouncement or its written order, no such requirement exists. *In re Jaron Z.*, 348 Ill. App. 3d at 263 ("our law is clear that a trial court need not articulate any specific rationale for its decision").

¶ 54 Here, even without addressing each statutory factor, the court clearly revealed the basis for its decision. The court addressed its prior *in camera* interview with Dalton and found him sufficiently intelligent and mature to decide where he wanted to live. It noted that Dalton was "absolutely thriving" in his current environment and was stable and loved. He felt that his foster family was his family, and they loved him back. The court also noted the fact that Dalton had been in foster care for over 1233 days and there was "no light at the end of the tunnel for return home."

24

¶ 55 In addition to the court's oral findings, nothing was submitted to rebut the evidence revealing that Dalton was properly fed and sheltered, his medical needs were met, he loved his school and friends, and his extracurricular activities. Nor was any evidence submitted that indicated any risk to Dalton remaining in substitute care. After consideration of the statutory factors, we cannot find that the trial court's determination that Dalton's best interests were best served by terminating Evlinda's parental rights was against the manifest weight of the evidence, and we agree with counsel's conclusion that no meritorious argument could be raised regarding the trial court's finding that it was in Dalton's best interests to terminate Evlinda's parental rights.

¶ 56                                III. CONCLUSION

¶ 57 On this record, no meritorious argument can be raised regarding the trial court's finding Evlinda unfit and that it was in Dalton's best interest to terminate her parental rights. Accordingly, we grant counsel's motion to withdraw and affirm the trial court's May 16, 2023, order finding Evlinda unfit and September 1, 2023, order finding it was in Dalton's best interest to terminate Evlinda's parental rights.

¶ 58 Motion granted; judgment affirmed.